**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
                                                 :

CAROLINE RICH,                            :

                      :       Civil Action No. 14-2075-BRM-DEA

             Plaintiff,      :

                      :

         v.             :

                      :

STATE OF NEW JERSEY,       :

NEW JERSEY DIVISION OF     :       **OPINION**

CHILDREN & FAMILIES,      :       **TEMPORARILY FILED UNDER SEAL**

ILA BHATNAGAR, and MARY BROWNE:

                      :

           Defendants.     :

_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants State of New Jersey (the "State"), New Jersey Division of Children and Families ("DCF") (together with the State, the "State Defendants"), Ila Bhatnagar ("Bhatnagar"), and Mary Browne's ("Browne") (together with Bhatnagar, the "Individual Defendants") (collectively, "Defendants") Motion for Summary Judgment against Plaintiff Caroline Rich ("Plaintiff"). (ECF No. 60.) Plaintiff opposes the Motion. (ECF No. 62.) Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

## I.   BACKGROUND

In this action brought under Title VII and the New Jersey Law Against Discrimination ("NJLAD"), Plaintiff asserts claims against Defendants for alleged retaliation in violation of Title VII and the NJLAD. As will be detailed below, Plaintiff alleges she was disciplined and terminated

due to her alleged participation in her supervisor's, Tracy Barco ("Barco"), arbitration proceeding ("Arbitration") and/or Plaintiff's decision to testify in her supervisor's employment discrimination lawsuit (the "Barco Lawsuit") against the State Defendants and refusal to testify on behalf of the State Defendants in both proceedings.

For the ease of the reader, before reciting the detailed facts, the Court will identify some individuals pertinent to this decision. Barco was an employee of DCF that was terminated in November 2011 and filed a grievance (that led to the Arbitration) and the Barco Lawsuit against the State Defendants. While an employee of DCF, she was Plaintiff's supervisor and Plaintiff testified in her Arbitration proceeding and allegedly agreed to testify in the Barco Lawsuit. (Def.'s Statement of Facts (ECF No. 60-2) ¶ 7 and Pl.'s Opp. to Def.'s Statement of Facts (ECF No. 63 ¶ 62).) Bhatnagar is currently the Director of Employee Relations at DCF. (ECF No. 60-2 ¶ 30 and ECF No. 63 ¶ 30.) Prior to Bhatnagar's employment with DCF, Bhatnagar was a lawyer in private practice whom Barco consulted for representation for her Arbitration against the State Defendants. (Bhatnagar Dep. (ECF No. 60-40) at 7:8-22, 30:8-11.) However, Barco never retained Bhatnagar as her lawyer. (*Id.* at 8:3-14.) Approximately six months after Barco consulted with Bhatnagar, Bhatnagar began working for DCF. (*Id.* at 14:14-17.) During her employment with DCF, Bhatnagar removed herself from any decisions regarding Barco's termination, but did not take any steps to remove herself from decisions regarding Plaintiff's case. (*Id.* at 14:20-15:5, 29:15-21.) Plaintiff alleges Barco listed her as a potential witness in the Barco Lawsuit in documents provided to Bhatnagar during their consultation, and that is why Defendants retaliated against her. (Barco's Decl. (ECF No. 62-27) ¶¶ 4-5 and Second Am. Compl. (ECF No. 27) ¶¶ 38-41.) Browne is a DCF manager at the Mercer South Local Office ("MSLO"). (ECF No. 60-2 ¶ 17 and ECF No. 63 ¶ 17.) Jacqueline Coleman-Kelly ("Coleman-Kelly") was one of Plaintiff's supervisors at DCF. (ECF

No. 63 ¶ 74.) Lastly, Nicole Colon was the Attorney General handling Barco's Arbitration, who Plaintiff allegedly informed she would be testifying on behalf of Barco for both the Arbitration and the Barco Lawsuit. (Pl.'s Dep. (ECF No. 60-39) at 82:6-11.) It is unclear from the record whether Colon also handled the Barco Lawsuit.

### a. Factual Background

Plaintiff allegedly began her employment with DCF as Family Service Specialist 2 ("FSS2") in the MLSO in September 2006. (ECF No. 60-2 ¶ 2; Pl.'s First Fitness For Duty ("FFD") Evaluation (ECF No. 60-20); ECF No. 63 ¶ 3.)[1] On November 16, 2011, Barco, while employed as Plaintiff's Supervisor at DCF, was issued a Preliminary Notice of Disciplinary Action ("PNDA") for failing to provide "direct supervisory oversight of the case manager" in violation of DCF Policy II, F.202, which "directs that supervisors are to conference all cases for which they are responsible with the assigned workers." (Barco's PNDA (ECF No. 60-8)). Specifically, the charges against her consisted of: (1) incompetency, inefficiency or failure to perform duties; (2) insubordination; (3) neglect of duty; and (4) other sufficient cause. (*Id.*) The PNDA notice stated she was to be removed from her employment at a time to be determined. (*Id.*)

As a result of the PNDA, Barco filed both the Barco Lawsuit against the DCF and a grievance through the union regarding labor disputes. (ECF No. 62-27); *see* ECF No. 60-39 at 13, 82:6-11.) In turn, the union filed a grievance with the State and DCF, and an Arbitration was scheduled at which Plaintiff testified. (*See* Tr. of Barco's Arbitration (ECF No. 60-21).) At the Arbitration, Plaintiff "never testified as to any discriminatory or retaliatory actions by Defendants

---

[1] Defendants allege Plaintiff was hired by DCF on September 6, 2005. (ECF No. 60-2 ¶ 2). Plaintiff contests this allegation and the record demonstrates Defendants allegations are inconsistent. (*See* ECF No. 60-20 at 409 (stating Plaintiff "graduated from Rutgers University – Camden in May 2005 and was an Investigator III for the NJ Department of Treasury from September 2005-September 2006").)

against [] Barco, or testified about or opposed any practices prohibited by Title VII or the [NJ]LAD." (ECF No. 60-2 ¶ 12 and ECF No. 63 ¶ 12.) Plaintiff's participation in Barco's proceedings is the underpinning of this lawsuit.

In Plaintiff's deposition for this lawsuit, she alleged she was being retaliated against (terminated and disciplined) because she informed Colon, the Attorney General handling Barco's Arbitration, that she would be a witness for Barco in her discipline matter. (ECF No. 60-39 at 82:6-11.) Plaintiff also claims retaliation based on "cooperation as a witness in arbitration filed by the union in a grievance and at PERC seeking relief for the violation of the Unfair Labor Practice." (ECF No. 63 ¶ 10; PERC Compl. (ECF No. 62-8).)

Plaintiff alleges Barco listed her as a potential witness in the Barco Lawsuit in documents provided to Bhatnagar, the Director of Employee Relations. (ECF No. 62-27 ¶¶ 4-5.) Plaintiff contends this is the reason Defendants retaliated against her. (ECF No. 27 ¶¶ 38-41.) However, Bhatnagar contends she does not recall Plaintiff being listed as a potential witness in any documents. Prior to Bhatnagar's employment with DCF, she was a lawyer in private practice that Barco consulted with "over the phone to ask [her] about legal counsel and legal representation" for a disciplinary issue she had as an employee of DCF. (ECF No. 60-40 at 7:8-22, 30:8-11.) Barco also allegedly brought a package to Bhatnagar's office containing documents pertaining to her PNDA and *Loudermill* hearing notice.[2] (*Id.* at 13:20-24.) Bhatnagar does not recall the package listing the names of any potential witnesses. (*Id.* at 13:13-20.) However, Barco never retained Bhatnagar as her lawyer. (*Id.* at 8:3-14.) Approximately six months after consulting with Barco,

---

[2] A *Loudermill* hearing is a due process hearing where an employee is entitled to the notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story. *Schmidt v. Creedon*, 639 F.3d 587, 596–97 (3d Cir. 2011) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)).

Bhatnagar began working for DCF. (*Id.* at 14:14-17.) During her employment with DCF, Bhatnagar removed herself from any decisions regarding Barco's termination, but did not take any steps to remove herself from decisions regarding Plaintiff's case. (*Id.* at 14:20-15:5, 29:15-21.) Defendants allege Bhatnagar was unaware Plaintiff would testify in the Barco Lawsuit. (ECF No. 60-2 ¶ 41.) Plaintiff acknowledges she had no "firsthand knowledge" of whether Bhatnagar knew she was going to be a witness for Barco. (ECF No. 60-2 ¶ 40 and ECF No. 63 ¶ 40). However, Defendants allege Plaintiff first notified them she would be a witness for Barco in July 2013, when she notified Colon. (ECF No. 60-2 ¶ 39 and ECF No. 60-39 at 114-15.)

In July 2013, Colon approached Plaintiff to be a potential witness for the State in the Barco Lawsuit (ECF No. 27 ¶ 14.) Plaintiff purportedly informed Colon she would be a witness for Barco. (*Id.* ¶¶ 14, 19; *see* Pl.'s Dep. (ECF No. 62-20) at 12.) Plaintiff informed Colon "she believed [] Barco was a victim of race discrimination and retaliation while she was employed at [DCF]." (ECF No. 27 ¶ 18.) Plaintiff alleges shortly after her interview with Colon, one of Plaintiff's supervisors, Coleman-Kelly, told her she should not become a witness for Barco "because it will get her in trouble." (ECF No. 27 ¶ 29 and ECF No. 63 ¶ 74.) Coleman-Kelly purportedly told Plaintiff on numerous occasions "you don't want to get involved in that stuff, you don't want to be worrying about [Barco], I'm telling you, girl, they're gonna [sic] walk you up out of here." (ECF No. 62-20 at 36:5-10.) She further contends Browne told her not to testify against management if she wanted a future at the MSLO. (*Id.* at 39:3-8.)

Defendants argue Plaintiff was terminated for failing to comply with DCF policies, poor performance, behavioral issues, and failing three FDD exams. (*See, e.g.,* ECF No. 60-6; ECF No. 60-7; ECF No. 60-13; ECF No. 60-20; ECF No. 60-22; ECF No. 60-23; ECF No. 60-25; ECF No. 60-26; ECF No. 60-29; ECF No. 60-30; ECF No. 60-31; ECF No. 60-32; ECF No. 60-35; ECF

No. 62-28). On July 13, 2011, Plaintiff met with Barco, Wes Shewring ("Shewring"), a caseworker supervisor, and Melinda P. Carnassale ("Carnassale"), a case practice specialist. (ECF No. 60-2 ¶ 16 and ECF No. 60-22). The meeting took place "to develop a work plan that would bring [Plaintiff's] caseload into compliance prior to her leaving for her scheduled vacation on 7/22/11." (Interoffice Memorandum (ECF No. 60-22).) Plaintiff acknowledges this meeting, however, denies her caseload did not comply with DCF policies. (ECF No. 63 ¶ 16). At the meeting it was determined Plaintiff "had a caseload of 19 cases which was well over the limit of 12." (ECF No. 60-22.) Plaintiff allegedly was very defensive and sarcastic during the meeting. (*Id.*) Carnassale also met with Plaintiff on her own on two separate occasions and experienced "similar defensiveness and sarcasm." (*Id.*) Specifically,

> On 8/17/11 and 8/22/11 I met with [Plaintiff] in my office to discuss issues with her caseload. Both times she started off raising her voice and threatening to "bring everyone down" with her. When asked what she was talking about she explained that if she is getting in trouble she would be bringing down the people she felt were responsible such as her supervisor. I would then explain to her that I was not trying to get her in trouble but to address the concerns with her work. She would then cry and get very emotional. She explained in both meetings that she knew she wasn't doing her best work and that she had become overwhelmed.

(*Id.*)

Carnassale was asked to evaluate Plaintiff via an interoffice memorandum and on October 5, 2011, stated:

> In summary, during my interaction with [Plaintiff] I found that she really wants to help people but doing this work seems to trigger something in her that becomes overwhelming. She seems to overstep boundaries when mental health is involved as evidenced in her actions in the cases stated above. In addition, she seemed to take the non-compliance of certain clients personally and react as such but no longer wanting to help then. She was observed to have no boundary control in terms of her clients calling her and spending hours on the phone with them. Even after given directives to have no phone calls during certain times, she still did. [Plaintiff] gets

extremely defensive and sarcastic during confrontation and then turns upset and appears overwhelmed.

(*Id.*)

On October 5, 2011, Browne requested that Plaintiff submit to a FFD evaluation. (ECF No. 60-2 ¶ 17 and ECF No. 63 ¶ 17). The request stated Plaintiff "has recently showed up to work and been unable to carry out work assignments" and "reported on several incidences that she is stressed and overloaded." (ECF No. 60-7.)  Plaintiff denies all these accusations. (ECF No. 63 ¶ 17(a)-(c).) No FFD was conducted. (Browne Dep. (ECF No. 60-41) at 63:14-19.)

On February 16, 2012, Coleman-Kelly issued Plaintiff a written disciplinary warning charging her with incompetency, inefficiency, or failure to perform duties because she disclosed confidential information to the children of a client assigned to her caseload. (ECF No. 60-2 ¶ 18; ECF No. 63 ¶ 18; Interoffice Memorandum (ECF No. 60-24)). Plaintiff admits she was issued a written warning, but disagrees that she did anything wrong. (ECF No. 63 at ¶ 18). In fact, Plaintiff confirms there was an incident where she was directed to transport seven children and, without knowing the mother's pregnancy was unknown to the children, she mentioned the mother was pregnant to the children. (Pl.'s Decl. (ECF No. 62-28) at 10-13.)

On February 21, 2013, Coleman-Kelly informed Browne Plaintiff was creating a hostile work environment and showing hostility toward her that was allegedly witnessed by other employees.  (ECF No. 60-2 ¶ 19 and Email from Coleman-Kelly (ECF No. 60-25)).  Plaintiff, again, denies she created a hostile work environment and that the presence of other employees was not mentioned in the warning.  (ECF No. 63 ¶ 19).

A third complaint and formal writing warning was issued by MSLO Management on February 28, 2013, for "unprofessional, inappropriate, and at times, insubordinate behaviors in the workplace and in the homes of clients."  (ECF No. 60-2 ¶ 20; ECF No. 63 ¶ 20; Interoffice

Memorandum (ECF No. 60-23).)  The written warning was allegedly sent because of the following

incidents:

- A co-worker reported that on September 20, 2012, while in the office of Supervising Family Service Specialist 2 (SFSS2) [] Coleman-Kelly you became argumentative and stated that you did not need a buddy to assist you with the placement of three (3) small children. Your interaction with [] Coleman-Kelly was described as "loud, rude and arrogant" as you also demanded that she immediately approve your overtime request from September 19, 2012.

- On January 23, 2013, while standing outside the office of the Mercer South Senior Management Assistant, Lori Raheming, you stated that "You know it's the Division's fault that the baby died." As a result of your comment you were counseled by Case Practice Specialist (CPS) Michelle Van De Wal that your statement was untrue and inappropriate. Subsequent to this discussion and in an effort to complete the Local Office Bank Account (LOBA) Request Form for Flex Funds to provide payment of the funeral services for the "S" Family you began working with SFSS@ Coleman-Kelly and [] Rahaming. Shortly thereafter you once again entered the office of CPS Michelle Van De Wal and were followed by Raheming. While in [] Van De Wal's office you became confrontational with [] Raheming and loudly stated that she had not properly completed the LOBA Request; therefore, you would not be receiving the check for the funeral home. You were redirected that [] Raheming had properly notified the interested parties and as it was after 5:00 p.m. the check would be issued on the next business day. You continued to be argumentative asserting that the check was needed immediately of the funeral would be delayed. After much redirection by your Case Work Supervisor and the CPS and several reassurances that expeditious payment would be made for the funeral services you concluded your tirade regarding the matter.

- ln February 2013, complaints were received from Family Preservations (FPS) and Children's Home Society (CHS) regarding your actions during a meeting with the T/D Family conducted on January 28, 2013. Reportedly, the meeting was scheduled to begin at 3:30 p.m. and you arrived 15 minutes late. As the meeting progressed, you repeatedly spoke in a loud tone about things which were not relevant to the family. Reportedly, you talked about your problems with your own daughter and got upset about another family you were working with and how you do not have enough time to devote to the case. Furthermore, you

reportedly stated throughout the meeting that FPS was requesting the removal of "K" from the home. The community providers where extremely concerned as "K" was upstairs in the home and could overhear your comments.

- It was also reported that during the January 28, 2013, meeting you engaged in a cell phone call from your supervisor and talked for approximately 15 minutes while the meeting was still going prior to finally excusing yourself. This action was unprofessional and in direct violation of DCF Administrative Policy ll.A.2909 - regarding ground rules during discussions and formal meetings with families.

- On February 14, 2013, SFSS2 Jacqueline Coleman-Kelly was participating in a meeting with FSS2 Yaphet Howard, SFSSl Robyera Revoal, CPS Michelle Van De Wal, DCP & P Assistant Director Nancy Carre Lee, and [] Browne, when you knocked on the door of the small conference room and requested to speak to [] Coleman-Kelly. You were informed that [] Coleman-Kelly could not be interrupted at the moment and you were referred to the covering supervisor for assistance. You refused the direction to seek assistance from the covering supervising by stating that you needed [] Coleman-Kelly to sign a Request for Reunification. You continued to argue that the document needed to be signed immediately and that you could not wait. Subsequently, you stormed away repeating that you would not wait and was [sic] going to facilitate the placement. Upon review of the document it was determined that the matter was not a reunification but a placement in a presumptive eligibility home with relatives which had been previously discussed and approved by the MSLOM and SFSS2 Coleman-Kelly.

(ECF No. 60-23.)

On April 2, 2013, Patricia Richardson, a Resource Development Specialist, sent an email complaint to Browne about Plaintiff's work performance. (Richardson Email Compl. (ECF No. 60-26) and ECF. No. 62 ¶ 22). The email stated Plaintiff was not returning client calls and was being disrespectful. (ECF No. 60-26.) Plaintiff denies the allegations. (ECF. No. 63 ¶ 22.) Additionally, on April 11, 2013, Defendants received an email complaint from Children's Home Society ("CHS") about Plaintiff disclosing her personal information to another family (ECF No. 60-2 ¶ 23 and ECF No. 60-27). CHS filed two more complaints on May 2 and July 1, 2013, about

Plaintiff and ultimately refused to work with Plaintiff on any case. (ECF No. 60-2 ¶ 24; Second Richardson Email Compl. (ECF No. 60-28); CHS's Letter Compl. (ECF No. 60-30).) The complaints generally stated Plaintiff had a "poor attitude," was defensive and unprofessional, disrespectful, sarcastic, and "short and snappy." (ECF No. 60-2 ¶ 24; ECF No. 60-28; ECF No. 60-30.)

On June 13, 2013, Jane Fields, senior staff member, and Browne signed a Recommendation for Disciplinary Action requesting that Plaintiff be suspended for four days due in part to the above complaints. (ECF No. 60-2 ¶ 25; ECF No. 63 ¶ 25; Recommendation for Disciplinary Action (ECF No. 60-29).)

Sometime in early July 2013, Plaintiff was served with a PNDA dated July 1, 2013, and signed by Bhatnagar, charging her with insubordination, conduct unbecoming a public employee, and other sufficient cause and called for Plaintiff to be suspended for five days. (ECF No. 60-2 ¶¶ 27, 43; ECF No. 63 ¶ 27; Pl's First PNDA (ECF No. 60-6).) The PNDA specified Plaintiff was issued written warnings directing her to refrain from engaging in unprofessional and discourteous behavior in February 2013, however, her behavior continues to be "inappropriate, disrespectful, discourteous, [and] disruptive." (ECF No. 60-6.) On July 3, 2013, CWA Local 1039 ("CWA") President Lionel Leach sent a letter to Bhatnagar appealing this PDNA on behalf of Plaintiff. (ECF No. 60-2 ¶ 44; ECF No. 63 ¶ 44; Letter Appealing PNDA (ECF No. 60-9).) Additionally, on July 25, 2013, Plaintiff filed a grievance against DCF for retaliating against her for testifying in Barco's "upcoming labor dispute." (ECF No. 60-2 ¶ 45 and Pl.'s Grievance (ECF No. 60-10).)

On August 13, 2013, DCF responded to CWA's letter noting it would not process Plaintiff's grievance because she was issued a PNDA prior to her grievance, and therefore, the matter would be handled through the disciplinary process. (ECF No. 60-2 ¶ 46; ECF No. 63 ¶ 46;

Defs.' Resp. to Pl.'s Grievance (ECF No. 60-11).) On October 11, 2013, CWA filed an Unfair Practice Charge ("ULP") on October 11, 2013 against DCF and the Governor's Office of Employee Relations ("OER"), alleging they engaged in unfair practices for failing to process Plaintiff's grievance. (ECF No. 60-2 ¶ 47; ECF No. 63 ¶ 47; UPL Charge (ECF No. 60-12).) Specifically, the charge stated:

> On July 25, 2013, a member of CWA . . . [Plaintiff] filed a grievance with her employer, [DCF], for retaliation and harassment. In return, the employer responded that they would not process her grievance on account that [Plaintiff] was given a [PNDA] prior to the grievance being filed and that the matter should be handled through the proper disciplinary process. However, the grievance had much more to do with other references of retaliation and harassment. Prior to being served with the [PNDA], [Plaintiff] was being called to be a witness for DCF management and refused to cooperate with the department. Instead, she is choosing to be a witness for the appellant in an upcoming arbitration termination case. Since that occurred, DCF has attempted to intimidate [Plaintiff] as a witness, harass her with disciplinary charges and direct her to attend a [FFD] examination by a state physician. These actions are all retaliatory in nature against [Plaintiff] for her not being a "compliable witness" for management. [Plaintiff] is a target at this point by [DCF]. The department knows that [Plaintiff] has been reaching out to the Union for assistance and she has filed previous complaints against DCF. Also, [Plaintiff] has made numerous requests over the years for reassignments and been denied.

(ECF No. 60-12.) The ULP requested the New Jersey Public Employment Relations Commission ("PERC") dismiss the disciplinary matter against Plaintiff, reassign her to a different office, and cease and desist any further harassment. (*Id.*)

On September 19, 2013, allegedly, as a result of her behavior, Plaintiff was referred by DCF to complete a FFD examination with Dr. Jonathon L. Rapaport. (ECF No. 60-2 ¶ 28 and ECF No. 60-20.) The reason for the evaluation was to determine if Plaintiff was "able to function successfully and [was] Fit for Duty now and whether she [would] be fit for duty in the foreseeable future in her position as a Family Service Specialist 2." (ECF No. 60-20 at 409.) Dr. Rapaport

conducted an interview of Plaintiff, a personality assessment inventory, and reviewed documents

sent from DCF—including complaints, medical issues, performance assessment reviews, and

performance evaluation systems. (ECF No. 60-2 ¶ 28(a) and ECF No. 60-20 at 409.) Dr. Rapaport

concluded Plaintiff

> has exhibited consistent problems with boundary issues
> (inappropriate sharing about personal matters, violating client's
> privacy), emotional dysregulation (outbursts of crying and
> screaming); has been rude, argumentative, unprofessional and
> defensive; displays scattered thinking, and is consistently tangential;
> has had episodes of poor judgment about cases that may have the
> potential of putting children in danger; has had psychomotor
> restlessness to the point of not being able to sit and stay in meetings
> without frequent breaks; has inability to listen, and inability to focus.
> She does not seem to be able to handle her disagreements with other
> workers in a professional manner.
>
> In conclusion, within a reasonable degree of psychological certainty,
> I believe that [Plaintiff] is NOT Fit at this time.
>
> . . . .
>
> She may be able to be fit for duty in the within [sic] three months if
> she is diligent with treatment.

(ECF No. 60-20 at 420.) As a result of the failed FFD examination, Plaintiff was required to extend

her previously approved leave of absence that was to last until October 24, 2013. (ECF No. 60-2

¶ 29; ECF No. 60-3 ¶ 29; ECF No. 60-33.) If Plaintiff chose not to extend her leave of absence,

she would be subject to disciplinary action and suspended without pay.  (Def. Letter Regarding

Leave of Absence (ECF No. 60-33).) Plaintiff chose to continue a previously taken leave of

absence after her failed October 19, 2013 FFD examination. (ECF No. 60-2 ¶ 29 and ECF No. 60-

3 ¶ 29.)

    On December 13, 2013, Plaintiff was directed to submit to a FDD re-examination with Dr.

Rapaport. (ECF No. 60-2 ¶ 30; ECF No. 63 ¶ 30; Letter Directing Pl. to Submit to FFD Evaluation

(ECF No. 60-34).) Accordingly, on December 26, 2013, Plaintiff completed a second FFD examination. (ECF No. 60-2 ¶ 30; ECF No. 63 ¶ 30; Pl.'s Second FFD Evaluation (ECF No. 60-31). His conclusions relied on another clinical interview, the documents sent prior to the original FDD examination, his prior examination report, and a beck depression inventory II test, and a consultation with Plaintiff's psychiatrist Dr. Rahman. (ECF No. 60-31 at 440.) Dr. Rahman allegedly stated he "was on the fence regarding his opinion about her ability to return to work at this time." (*Id.* at 449.) Ultimately, Dr. Rapaport found while there were some improvements with Plaintiff's condition, given the high bar required in terms of emotional health to perform her job, she was not fit for duty and may be fit within two to three months if she: demonstrated acceptance of her dual diagnoses, improved her emotional stability, developed a more goal-oriented mindset, and learned to express her disagreements with other staff and DCF in a productive and professional manner. (*Id.* at 449.) Plaintiff denies the allegations contained in Dr. Rapaport's report and that Dr. Rahman reflected any of those comments or conclusions. (*See* ECF No. 63 ¶ 31.)

On January 30, 2014, Plaintiff was issued another PNDA for conduct unbecoming of a public employee, neglect of duty, and other sufficient causes, and suspending her for ten days. (ECF No. 60-2 ¶ 32). The PNDA alleged Plaintiff attempted to interfere with a Child Protective Services investigation on October 2013. (Pl.'s Second PNDA (ECF No. 60-35).) Specifically, it alleges Plaintiff identified herself as a Child Protection and Permanency employee and attempted to obstruct investigators who reported to her home in response to an allegation of a child who required hospitalization due to physical abuse. (*Id.*)

On April 11, 2014, at the request of DCF, Plaintiff completed a third FFD examination with Dr. Rapaport. (ECF No. 60-2 ¶ 34; ECF No. 63 ¶ 34; Pl.'s Third FFD Evaluation (ECF No. 60-32).) This time his sources of information only included a clinical interview, a review of

supporting documents sent prior to the first FFD examination, and his previous reports. (ECF No. 60-32 at 453.) During the examination Dr. Rapaport learned that Plaintiff submitted a note written by Dr. Rahman to DCF stating: "Please note that [Plaintiff] has been in attendance with therapy sessions at our facility. She expresses a desire to work, and appears at this time, to be able to do so. She voices being able to manage unusually overwhelming work-related stressors, should they arise." (*Id.* at 459.) Dr. Rapaport attempted to contact Dr. Rahman regarding his note, however, was unsuccessful. (*Id.* at 462.) Dr. Rapaport was concerned with the note because it focused on Plaintiff's opinion of herself, rather than Dr. Rahman's medical opinion or observations. (*Id.*) Ultimately, Dr. Rapaport concluded Plaintiff was not emotionally equipped to deal with children who were abused or neglected, found she was not fit for duty at this time, and that her ability to be fit in the near future was "guarded to poor."  (*Id.*)

Notably, Bhatnagar stated it is unusual for there to be this many FFD requests, since most employees are terminated after the first. (ECF No. 62-17 at 27: 1-4.) However, DCF gave Plaintiff three FFD examinations because they "were giving her time to try to meet Dr. Rapaport's recommendations and get better and be fit for duty." (*Id.* at 27:7-9.) Cheryl Mascara and Mark Kears, employees in human resources both testified they never heard of someone having three FFD's in such a short timeframe. (*Id.* at 80:9-22.)

On May 28, 2014, Plaintiff was issued another PNDA for failing to perform her duties and other sufficient cause, and terminating her employment. (ECF No. 60-2 ¶ 35; ECF No. 63 ¶ 35; Pl.'s Last PNDA (ECF No. 60-13).) The PNDA highlighted that Plaintiff had been absent from work since August 2013, for failure to pass her FFD examinations. (ECF No. 60-13.) It further stated, "DCF granted you successive leaves of absence in order to afford you with time to become able to perform the essential functions of your job . . . , but you continue to not be fit for duty."

(*Id.*) On May 30, 2014, Browne and Fields approved the Recommendation of Disciplinary action that proposed to terminate Plaintiff's position. (ECF No. 60-2 ¶ 36; ECF No. 63 ¶ 36; ECF No. 60-37).

### 1.  Unfair Practice Charges and PERC

On July 1, 2014, CWA, on behalf of Plaintiff, requested PERC issue a complaint ("ULP Complaint") against the State. (ECF No. 60-2 ¶ 50; ECF No. 60-3 ¶ 50; ECF No. 60-14.) On July 21, 2014, the Director of Unfair Practices, acknowledged that the allegations of the ULP Complaint, if true, "may constitute unfair practices" and scheduled a formal proceeding. (ECF No. 60-2 ¶ 51 and ECF No. 63 ¶ 51). Accordingly, on July 10, 2014, charging party CWA/Plaintiff filed a complaint with PERC alleging the State violated of N.J.S.A. § 34:13A-5.4(a)(3), which states: "Public employers, their representatives or agents are prohibited from discriminating in regard to the hire or tenure of employment or any term or condition of employment to encourage or discourage employees in the exercise of the rights guaranteed to them by this act" when: (1) "it launched a series of disciplinary threats and retaliatory actions against [Plaintiff] because of her plan to testify against State" and (2) it restrained and coerced Plaintiff "from exercising her right to testify against State." (*See* PERC Compl. (ECF No. 60-16).) It further alleged the State violated N.J.S.A. § 34:13A-5.4, which states: "Grievance and disciplinary review procedures established by agreement between public employer and the representative organization shall be utilized for any dispute covered by the terms of such agreement," when it denied Plaintiff her right to file a grievance. (*Id.*) Plaintiff acknowledges the issues raised in the PERC complaint mirror those raised in this present litigation. (ECF No. 60-2 ¶ 54 and ECF No. 60-3 ¶ 54.) On August 3, 2016, PERC dismissed the charges against DCF when CWA failed to advise them of the matter's status pursuant to N.J.A.C. 19: 14-1.5(d). (ECF No. 60-2 ¶ 55 and ECF No. 60-3 ¶ 55.)

Notably, Plaintiff received satisfactory work performance evaluations from August 2007 to August 31, 2012. (*See* ECF Nos. 62-4, 62-5, 62-6, and 62-7.) From September 1, 2012, to August 31, 2013, while receiving a commendable overall rating, she received many unsatisfactory points and refused to sign the performance assessment review. (ECF No. 62-4.)

### b.        Procedural History

On April 2, 2014, Plaintiff, Marie-Joe Farrior, and Okey Sibeu (collectively, "Plaintiffs") filed a complaint against the State, DCF, Browne, Shrewing, and Bhatnagar alleging seven causes of action: (1) violations of the 14th Amendment equal protection clause (Count One); (2) violations of 42 U.S.C. § 1981 (Count Two); (3) violations of 42 U.S.C. § 1983 (Count Three); (4) violations of Title VII for discriminating against them because of their "race and national origin and allowed them to be subjected to retaliation, scorn and ridiculed by their fellow employees" (Count Four); (5) violations of the Conscientious Employee Protection Act ("CEPA") (Count Five); (6) violations of the NJLAD because Plaintiffs "were subjected to disability, race and national origin discrimination and retaliation" (Count Six); and (7) violations of the Americans with Disabilities Act ("ADA") (Count Seven). (Compl. (ECF No. 1).) On July 28, 2014, prior to serving the Complaint, Plaintiffs filed an amended complaint alleging the same causes of action and served Defendants with the Amended Complaint. (ECF Nos. 5, 6, 7, 8, 9.)

On October 5, 2014, Defendants filed a motion to dismiss the amended complaint in lieu of an answer. (ECF No. 17.) On May 12, 2015, the Court entered an Order granting in part and denying in part Defendants' motion to dismiss. (ECF Nos. 25, 26.) Specifically, in relevant part, the Order dismissed Counts One, Two, Five, and Seven of the amended complaint in their entirety; dismissed Count Three as it related to the State Defendants and the Individual Defendants in their official capacities; dismissed Count Four as to the Individual Defendants only; and dismissed

Count Six as it related to the State Defendants and the Individual Defendants in their official capacities. (ECF No. 26.)

On June 11, 2015, Plaintiffs filed a Second Amended Complaint alleging: (1) violations of the 14th Amendment (Count One); (2) violations of 42 U.S.C. § 1981 as to Farrior and Sibedu only (Count Two); (3) violations of 42 U.S.C. § 1983 by virtue of having violated § 1981 (Count Three); (4) violations of Title VII for discriminating against Farrior and Sibedu only (Count Four); (5) violations of Title VII against Plaintiffs when they retaliated against them for "activities and actions relating to complaints of race and national origin discrimination, and activities relating to cooperation with EEO investigations" and subjecting them to hostile work environments (Count Five); (6) violations of the NJLAD because Plaintiffs "were subjected to disability, race and national origin discrimination and retaliation" and "individual defendants engaged in discrimination against Plaintiff [] because of her disabilities" (Count Six); and (7) violations of the Americans with Disabilities Act ("ADA") (Count Seven). (ECF No. 27.)

On June 15, 2015, Defendants filed a letter claiming the Second Amended Complaint was not in compliance with the Court's Opinion and Order dated May 12, 2015. (ECF No. 28.) Specifically, Defendants purported there were three separate claims under 42 U.S.C. § 1983 against all Defendants when the Court stated it lacked subject matter jurisdiction as to these claims. (*Id.*) On June 30, 2015, the parties' issued a Stipulation, which was entered by the Court, maintaining: (1) Count Seven is dismissed from the Second Amended Complaint with prejudice; (2) Counts One, Two, and Three from the Second Amended Complaint are solely directed against the Individual Defendants in their individual capacities; (3) Counts Four and Five from the Second Amended Complaint are solely directed against the State Defendants; (4) Count Six from the Second Amended Complaint is solely directed against the Individual Defendants in their individual

capacities; and (6) defendant Shewring is dismissed with prejudice. (Parties Stipulation (ECF No. 33).)

On September 12, 2016, following a settlement conference, plaintiffs Farrior and Sibedu settled with Defendants. (ECF No. 55 and ECF No. 71.) As a result, all of their claims against the defendants were also dismissed from the matter. The parties agree only two counts—Count Five and Count Six—remain. (ECF No. 60-1 at 5 and ECF No. 62 at 3.) They further agree Count Five is a Title VII claim solely against the State Defendants for retaliation. (ECF No. 60-1 at 5 and ECF No. 62 at 3.) However, they disagree as to the parameters of Count Six. Defendants argue Count Six is limited to an NJLAD claim against the Individual Defendants in their individual capacities for retaliation (ECF No.60-1 at 5),[3] while Plaintiff argues Count Six contains NJLAD claims against the Individual Defendants in their individual capacities for retaliation, hostile work environment, and disability discrimination (ECF No. 62 at 3). The Court will address this below.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

---

[3] Defendants argue "no disability claim under the [NJ]LAD was pled in Plaintiff's Second Amended Complaint." (ECF No. 60-1 at 5.)

judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.  DECISION

### A.  Retaliation Under NJLAD and Title VII

Defendants argue Plaintiff cannot make a *prima facie* case for retaliation under either the NJLAD or Title VII because she did not engaged in protected activity, the protected activity was not casually related to her termination, and they had legitimate business reasons for terminating her. (ECF No. 60-1 at 7-17.) Plaintiff contends she engaged in protected activity, which was casually related to her termination, and Defendants had no legitimate reason for terminating her. (ECF No. 62 at 5-16.)

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

20

As to the "protected activity" element, "the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Id.* at 341 (citing *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)). "The 'opposition clause' prohibits retaliation because the employee opposed any practice made unlawful by Title VII." *Tuthill v. Consol. Rail Corp.*, No. 96-6868, 1997 WL 560603, at *3 (E.D. Pa. Aug. 26, 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998). "'Opposition' to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management." *Paradisis v. Englewood Hosp. & Med. Ctr.*, No. 13-5936, 2016 WL 4697337, at *13 (D.N.J. Sept. 6, 2016), *aff'd sub nom.*, 680 F. App'x 131 (3d Cir. 2017). "The 'participation clause' prohibits retaliation because the employee 'charged, testified, assisted or participated' in an 'investigation, proceeding or hearing' under Title VII." *Tuthill*, 1997 WL 560603, at *3.

The distinction between the two different clauses "is significant because the levels of statutory protection differ." *Slagle*, 435 F.3d at 266. The "participation clause" "offers much broader protection to Title VII employees than does the 'opposition clause.'" *Id.*; *see also Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003) ("[C]ourts have consistently recognized [that] the explicit language of § 704(a)'s participation clause is expansive and seemingly contains no limitations."). "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Clark Cty. v. Breeden*, 532 U.S. 268, 271 (2001) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination); *Aman v. Cort Furniture Rental Corp.*,

85 F.3d 1074, 1085 (3d Cir. 1996) (holding plaintiff must "act[ ] under a good faith, reasonable belief that a violation existed")). Furthermore, the employee's "opposition" to unlawful discrimination must not be ambiguous. *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

To establish the third element[4] of the Title VII *prima facie* case, "a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F.3d at 341–42. "In determining whether a plaintiff has produced prima facie evidence of causation, the decisions of our Court of Appeals have generally focused on two indicia: timing and evidence of ongoing antagonism." *Hargrave v. Cty. of Atl.*, 262 F. Supp. 2d 393, 424 (D.N.J. 2003). Timing of an employer's adverse employment action, alone, will not provide *prima facie* evidence that the disciplinary action was attributable to retaliatory motives, however, "the temporal proximity between an employer's action and an employee's protect activity may permit an inference of causation where the relatively short interval between the two is 'unusually suggestive' of retaliation." *Id.* Timing and proof of antagonism are not the only methods by which a plaintiff can prove causation. *Id.* at 425. "[T]he case law has set forth few limits on the type of evidence which might suffice to establish a prima facie showing of causation." *Id.*

If the employee establishes a *prima facie* case of retaliation, the *McDonnell Douglas* burden shifting analysis applies, "in which 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to

---

[4] Defendants do not dispute Plaintiff's termination was an adverse employment action, the second element of the Title VII and NJLAD *prima facie* case. (ECF No. 60-1 at 7.) Accordingly, the Court will not address this element.

convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

Similarly, the NJLAD provides it is unlawful to:

> to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

N.J.S.A. § 10:5-12(d). To establish a *prima facie* claim for retaliation under the NJLAD, a plaintiff must demonstrate: "(1) that she engaged in protected activity; (2) the activity was known to the employer; (3) plaintiff suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action." *Young v. Hobart W. Grp.*, 385 N.J. Super. 448, 465 (App. Div. 2005).

With respect to the first element, "a person engages in protected activity under the [NJ]LAD when that person opposes any practice rendered unlawful under the [NJ]LAD." *Id.* at 466. The NJLAD "operates not only to fight discrimination wherever it is found, but to protect those who assist in rooting it out." *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 260 (2010).

Once a plaintiff establishes a *prima facie* case of retaliation under the NJLAD, the defendants must "articulate a legitimate, non-retaliatory reason for the decision." *Romano v. Brown & Williamson Tobacco Corp.,* 284 N.J. Super. 543, 549 (App. Div. 1995). Then, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." *Id.*

The standard for retaliation under the NJLAD is similar to the analysis applied to Title VII retaliation claims. *See, e.g.*, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (applying the *McDonnell Douglas* burden shifting analysis to federal and state retaliation claims); *Aman*, 85 F.3d at 1087–88 (finding the NJLAD claims "parallel" Title VII claims); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (applying the same retaliation standard to both NJLAD and Title VII claims); *White v. Cleary*, No. 09-4324, 2012 WL 924338, at *9 (D.N.J. Mar. 19, 2012), *aff'd*, 513 F. App'x 224 (3d Cir. 2013) (same). Accordingly, this Court will analyze the claims jointly.

### 1. Protected Activity

Defendants argue Plaintiff did not engage in a protected activity because Plaintiff alleges she was retaliated against for testifying on behalf of Barco's at her Arbitration, not the Barco Lawsuit. (ECF No. 60-1 at 9.) Specifically, they contend the Arbitration was not a proceeding brought pursuant to the NJLAD or Title VII, and therefore Plaintiff is required to demonstrate she complained about or opposed practices prohibited by Title VII or the NJLAD and has failed to do so. (*Id.*) They maintain that a review of the Arbitration transcript reveals Plaintiff did not complain about any prohibited activity. (*Id.*)

Plaintiff argues she was listed as a witness for both the Barco Lawsuit and arbitration, and that Bhatnagar was aware of her intentions to testify in both proceedings when Barco consulted with her prior to her employment with DCF. (ECF No. 62 at 8-9.) She further argues she informed Colon she "believed Barco was a victim of race discrimination and retaliation during her employment at DCF and that she would be a witness for Barco in her discrimination lawsuit." (*Id.* at 9.) She further contends, she was asked to be a witness for the Barco Lawsuit, but declined. (*Id.* at 9-10.) Lastly, Plaintiff argues "she did not understand that a distinction exists between an

employment law case and a union arbitration case as she believes both could be referred to as labor disputes." (*Id.* at 11.)

While the NJLAD and Title VII define protected activity similarly, the NJLAD requires that an employee "show that he or she engaged in protected activity known by the employer." *Abramson*, 260 F.3d at 286 n.17; *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629 (1995). The Court finds there is a genuine issue of material fact as to whether Plaintiff engaged in a protected activity as to all Defendants.

The record provides evidence from which a reasonably jury could find DCF, the State, and Browne knew Plaintiff intended to be a witness for both the Barco Lawsuit and Arbitration. While Plaintiff did not testify at the Barco lawsuit, there is a genuine issue of material fact as to whether she "assisted or participated" in an "investigation, proceeding or hearing" under Title VII or the NJLAD, since she alleges she agreed to be a witness for both the Barco Lawsuit and Arbitration. In her deposition, Plaintiff stated:

> I specifically told [] Colon that [] Barco was not the person who is responsible for closing that case, that [] Shrewing was responsible for closing that case, that I saw him instruct her to close that case, that I believe that it's not fair that he only got a few days and that she was fired, *that I had already shared this information with [] Browne.* I was told to take a sick leave or I was gonna [sic] be disciplined, and when I came back I could be under Patricia Holbig and not be disciplined.
>
> I didn't know at the time that I was going out on that sick leave that Tracey was getting fired, but I did tell them that I knew that Tracey was not the person that did that, and also I knew that – *about [] Barco meeting with [Bhatnagar]* and I knew about what she – she asked me what I thought and I told her I thought that [] Barco got – was a scapegoat in this case and that – *that is was because she was black and that this case was covered up and that –* you know, she asked me a lot of questions and I just – I just answered them. And at first mostly we discussed that I didn't want to talk to her about it, *that I was already gonna [sic] be a witness for [] Barco* and I said I didn't want to talk to them, but they continued to say I did have to talk to them.

> *I told her how I told [] McKinnis already yesterday that I didn't want to have to be questioned by them because I had already agreed to be a witness for [] Barco and the union and* – and discussed that and discussed working with her in her arbitration and talked to her first attorney . . . .

(ECF No. 60-38 at 162:2-163:14 (emphasis added).) Although she did not specify what matter she would testify for, the Arbitration or the Barco Lawsuit, a reasonable jury could infer both. Further, Plaintiff's Declaration clarifies the statements she "made to . . . Colon regarding testifying for Barco was in reference to testifying at her arbitration as well as at her discrimination case in federal court." (ECF No. 62-28 ¶ 29.) By agreeing to be a witness, or in other words, agreeing to assist or participate in the Barco Lawsuit, as opposed to simply being listed as a potential witness, Plaintiff engaged in protected activity. Title VII and the NJLAD are remedial statutes, which must be interpreted liberally. *See, e.g.*, *Slagle*, 435 F.3d at 267 (noting "because Title VII is a remedial statute, it must be interpreted liberally"); *Bowers v. NCAA*, 346 F.3d 402, 431 n.24 (3d Cir. 2003) ("We recognize that []Title VII is clearly remedial civil rights legislation . . . ."); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 204 (3d Cir. 1998) (noting that liberal construction of a statute is appropriate where that statute is remedial); *Quinlan*, 204 N.J. at 259 ("We have long recognized that the essential purpose of the [NJ]LAD is the eradication of the cancer of discrimination. We have been vigilant in interpreting the [NJ]LAD in accordance with that overarching purpose, and in recognition that it is, by its terms . . . remedial legislation that was intended to be given a broad and liberal interpretation.") (citations omitted).

Additionally, Plaintiff's testimony at her deposition that Barco was terminated because she was "black," creates genuine issues of material fact as to whether Plaintiff opposed an unlawful practice under Title VII or the NJLAD. (ECF No. 60-38 at 162:2-163:14.) Based on that testimony, a reasonable jury could conclude Plaintiff refused to be a witness for the State Defendant's in the

Barco Lawsuit because she believed Barco was being discriminated against based on her race in violation of the NJLAD and Title VII. (ECF No. 60-38 at 162:2-163:14.) In expressing why she did not want to testify for the State Defendants, Plaintiff alleges she stated Barco was a victim because she was "black." This fits within the mandates of *Barber*, which found that complaints about unfair treatment in general and expressing ones dissatisfaction with the fact that someone else was awarded a positon, but failing to specifically complain about discrimination is not protected activity. *Barber*, 68 F.3d at 701. Here, Plaintiff specifically complained about race discrimination to Colon, the Attorney General representing the State Defendants, putting the State Defendants on notice that she opposed their discriminatory practices and alleges to have also told Browne the same thing. (*See* ECF No. 60-38 at 162:2-163:14.)

Further, Plaintiff's testified at her deposition that Bhatnagar was aware she would be testifying as a witness for Barco and that Barco showed Plaintiff emails between Barco and Bhatnagar verifying this. (ECF No. 60-39 at 54-55.) Although the testimony does not specify whether Bhatnagar was aware Plaintiff would be testifying as a witness for the Arbitration or the Barco Lawsuit, a reasonable jury could determine it was both. Accordingly, the Court finds there are genuine issues of material fact as to whether Plaintiff engaged in a protected activity under the NJLAD and Title VII as to all Defendants.

### 2.  Causal Connection

Defendants contend there is no causal connection between Plaintiff's testimony at the Arbitration and her ultimate termination. (ECF No. 60-1 at 10.) Defendant argue Plaintiff was terminated because she failed three FFD's and the evidence demonstrates "Defendant Browne requested that Plaintiff be sent for an FFD before Plaintiff indicated that she would be a witness for [] Barco and long before [] Barco's discipline was issued." (*Id.*) Plaintiff claims there is a casual

connection because she was told multiple times by Defendant Browne not to testify against management if she wanted to have a future at DCF. (ECF No. 62 at 11.) She further alleges, shortly after informing the State Defendants she would not testify in their favor, she "began to receive threats of disciplinary action from [] Shrewing, a close aide to Defendant Browne." (*Id.* at 12.) She also contends she was required to attend a FFD examination shortly after her disclosure to Colon. (*Id.*)

The Court finds there is no casual connection between Plaintiff's protected activity and her termination. The record demonstrates Plaintiff's employment performance was decreasing and her employment was at risk prior to Barco's termination in November 16, 2011, and prior to Defendants becoming aware of Plaintiff's desire to testify on behalf of Barco. (ECF No. 60-8 (Barco's termination date).) On July 13, 2011, Plaintiff met with Barco, Shewring, and Carnassale "to develop a work plan that would bring [Plaintiff's] caseload into compliance prior to her leaving for her scheduled vacation on 7/22/11." (ECF No. 60-2 ¶ 16; ECF No. 60-22; ECF No. 63 ¶ 16.) At the meeting it was determined Plaintiff "had a caseload of 19 cases which was well over the limit of 12." (*Id.*) Plaintiff also very defensive and sarcastic during the meeting. (*Id.*) Carnassale also met with Plaintiff on her own on two separate occasions and experienced "similar defensiveness and sarcasm." (*Id.*) Specifically,

> On 8/17/11 and 8/22/11 [she] met with [Plaintiff] in [her] office to discuss issues with her caseload. Both times she started off raising her voice and threatening to "bring everyone down" with her. When asked what she was talking about she explained that if she is getting in trouble she would be bringing down the people she felt were responsible such as her supervisor. [Carnassale] would then explain to her that I was not trying to get her in trouble but to address the concerns with her work. She would then cry and get very emotional. She explained in both meetings that she knew she wasn't doing her best work and that she had become overwhelmed.

(*Id.*)

Carnassale was asked to evaluate Plaintiff via an interoffice memorandum and on October

5, 2011, stated:

> In summary, during my interaction with [Plaintiff] I found that she really wants to help people but doing this work seems to trigger something in her that becomes overwhelming. She seems to overstep boundaries when mental health is involved as evidenced in her actions in the cases stated above. In addition, she seemed to take the non-compliance of certain clients personally and react as such but no longer wanting to help them. She was observed to have no boundary control in terms of her clients calling her and spending hours on the phone with them. Even after given directives to have no phone calls during certain times, she still did. [Plaintiff] gets extremely defensive and sarcastic during confrontation and then turns upset and appears overwhelmed.

(*Id.*)

Further, on October 5, 2011, Browne requested for Plaintiff to submit to a FFD evaluation.

(ECF No. 60-2 ¶ 17 and ECF No. 63 ¶ 17.) The request stated Plaintiff "has recently showed up to

work and been unable to carry out work assignments" and "reported on several incidences that she

is stressed and overloaded." (ECF No. 60-7.) Although no FFD was actually conducted as a result

of this request, it demonstrates DCF was dissatisfied with Plaintiff's performance prior to Barco's

termination. (ECF No. 60-41 at 63:14-19.)

In addition, Plaintiff continued to underperform and be disciplined prior to informing

Colon that she would be testifying for Barco in July 2013. On February 16, 2012, Coleman-Kelly

issued Plaintiff a disciplinary written warning charging her with incompetency, inefficiency, or

failure to perform duties because she disclosed confidential information to the children of a client

assigned to her caseload. (ECF No. 60-2 ¶ 18; ECF No. 63 ¶ 18; ECF No. 60-24.) Plaintiff admits

she was issued a written warning. (ECF No. 63 at ¶ 18.) In fact, Plaintiff confirms there was an

incident where she was directed to transport seven children and, without knowing the mother's

pregnancy was unknown to the children, she mentioned the mother was pregnant to the children.

(ECF No. 62-28 at 10-13.) Further, on February 21, 2013, Coleman-Kelly informed Browne that Plaintiff was creating a hostile work environment and showing hostility toward her that was allegedly witnessed by other employees.  (ECF No. 60-2 ¶ 19 and ECF No. 60-25.)

A third complaint and formal writing warning was issued by MSLO management on February 28, 2013, for "unprofessional, inappropriate, and at times, insubordinate behaviors in the workplace and in the homes of clients."  (ECF No. 60-2 ¶ 20; ECF No. 63 ¶ 20; ECF No. 60-23.) The written warning was allegedly sent because of the following incidents:

- A co-worker reported that on September 20, 2012, while in the office of Supervising Family Service Specialist 2 (SFSS2) [] Coleman-Kelly you became argumentative and stated that you did not need a buddy to assist you with the placement of three (3) small children. Your interaction with [] Coleman-Kelly was described as "loud, rude and arrogant" as you also demanded that she immediately approve your overtime request from September 19, 2012.
- On January 23, 2013, while standing outside the office of the Mercer South Senior Management Assistant, Lori Raheming, you stated that "You know it's the Division's fault that the baby died." As a result of your comment you were counseled by Case Practice Specialist (CPS) Michelle Van De Wal that your statement was untrue and inappropriate. Subsequent to this discussion and in an effort to complete the Local Office Bank Account (LOBA) Request Form for Flex Funds to provide payment of the funeral services for the "S" Family you began working with SFSS@ Coleman-Kelly and [] Raheming. Shortly thereafter you once again entered the office of CPS Michelle Van De Wal and were followed by Raheming. While in [] Van De Wal's office you became confrontational with [] Raheming and loudly stated that she had not properly completed the LOBA Request; therefore, you would not be receiving the check for the funeral home. You were redirected that [] Raheming had properly notified the interested parties and as it was after 5:00 p.m. the check would be issued on the next business day. You continued to be argumentative asserting that the check was needed immediately of the funeral would be delayed. After much redirection by your Case Work Supervisor and the CPS and several reassurances that expeditious payment would be made for the funeral services you concluded your tirade regarding the matter.

- In February 2013, complaints were received from Family Preservations (FPS) and Children's Home Society (CHS) regarding your actions during a meeting with the T/D Family conducted on January 28, 2013. Reportedly, the meeting was scheduled to begin at 3:30 p.m. and you arrived 15 minutes late. As the meeting progressed, you repeatedly spoke in a loud tone about things which were not relevant to the family. Reportedly, you talked about your problems with your own daughter and got upset about another family you were working with and how you do not have enough time to devote to the case. Furthermore, you reportedly stated throughout the meeting that FPS was requesting the removal of "K" from the home. The community providers where extremely concerned as "K" was upstairs in the home and could overhear your comments.

- It was also reported that during the January 28, 2013, meeting you engaged in a cell phone call from your supervisor and talked for approximately 15 minutes while the meeting was still going prior to finally excusing yourself. This action was unprofessional and in direct violation of DCF Administrative Policy ll.A.2909 - regarding ground rules during discussions and formal meetings with families.

- On February 14, 2013, SFSS2 Jacqueline Coleman-Kelly was participating in a meeting with FSS2 Yaphet Howard, SFSS1 Robyera Revoal, CPS Michelle Van De Wal, DCP & P Assistant Director Nancy Carre Lee, and [] Browne, when you knocked on the door of the small conference room and requested to speak to [] Coleman-Kelly. You were informed that [] Coleman-Kelly could not be interrupted at the moment and you were referred to the covering supervisor for assistance. You refused the direction to seek assistance from the covering supervising by stating that you needed [] Coleman-Kelly to sign a Request for Reunification. You continued to argue that the document needed to be signed immediately and that you could not wait. Subsequently, you stormed away repeating that you would not wait and was going to facilitate the placement. Upon review of the document it was determined that the matter was not a reunification but a placement in a presumptive eligibility home with relatives which had been previously discussed and approved by the MSLOM and SFSS2 Coleman-Kelly.

(ECF No. 60-23.)

On April 2, 2013, Patricia Richardson, a Resource Development Specialist, sent an email complaint to Browne about Plaintiff's work performance. (ECF No. 60-26 and ECF. No. 62 ¶ 22.)

The email demonstrated that Plaintiff was not returning client calls and was being disrespectful. (ECF No. 60-26.) Additionally, on April 11, 2013, Defendants received an email complaint from CHS about Plaintiff disclosing her personal information to another family (ECF No. 60-2 ¶ 23 and ECF No. 60-27.) CHS filed two more complaints on May 2 and July 1, 2013, about Plaintiff and ultimately refused to work with plaintiff on any case. (ECF No. 60-2 ¶ 24; ECF No. 60-28; ECF No. 60-30.) The complaints generally stated, Plaintiff had a "poor attitude," was defensive and unprofessional, disrespectful, sarcastic, and "short and snappy." (ECF No. 60-2 ¶ 24; ECF No. 60-28; ECF No. 60-30.)

Notably, Plaintiff also received her first PNDA and suspension prior to informing Colon that she would be testifying for Barco.

> Q. Can you tell me when did you tell DAG Colon that you were going to testify on behalf of [] Barco?
> A. July 2013.
>         . . . .
> Q. Can you tell me what specifically you said to DAG Colon about your desire to testify for [] Barco?
> A. I was told that I was being suspended and the same day, five day suspension.
>         . . . .
> Q. So, you mentioned there was a corrective action that you were given?
> A. Yeah.
> Q. And that was prior to your meeting with DAG Colon?
> A. Yeah.
> Q. So, that was prior to your telling DAG Colon that you were going to testify on behalf of [] Barco?
> A. Yeah. . . .

(ECF No. 60-39 at 9:17-12:23.) Sometime in early July 2013, Plaintiff was served with a PNDA dated July 1, 2013, charging her with insubordination, conduct unbecoming a public employee, and other sufficient cause and called for Plaintiff to be suspended for five days. (ECF No. 60-2 ¶ 27; 43; ECF No. 63 ¶ 27; ECF No. 60-6.) The PNDA specified that Plaintiff was issued written

warnings directing her to refrain from engaging in unprofessional and discourteous behavior in February 2013, however, her behavior continues to be "inappropriate, disrespectful, discourteous, [and] disruptive." (ECF No. 60-6.) Again, the timing demonstrates the State Defendants and Browne's termination of Plaintiff was not attributable to her protected activity.

While Plaintiff argues Bhatnagar was aware she would testify in Barco's Arbitration and/or the Barco Lawsuit as early as November 2011 (Barco's termination), when Barco consulted with Bhatnagar prior to her employment with DCF, there is no evidence Barco informed DCF, the State, or Browne about Plaintiff's intention to testify. Indeed, the evidence demonstrates Bhatnagar removed herself from anything relating to Barco's Arbitration and the Barco Lawsuit and did not engage in any communications with DCF, Browne, or the State regarding Barco. (*See* ECF No. 60-40 at 14-17.) Without any evidence demonstrating Bhatnagar informed DCF, the State, or Browne of Plaintiff's intention to testify prior to July 2013, the Court cannot and will not infer they knew of Plaintiff's intentions to testify just because Bhatnagar was aware.

The record is clear that three other FFD evaluations and two other PNDA's occurred after Defendants became aware of Plaintiff's intention to testify on behalf of Barco and after Plaintiff opposed DCF's racial discriminatory practices. However, because DCF, the State, and Browne engaged in similar practices prior to being aware of Plaintiff's protected activity, the Court finds there was no casual connection between Plaintiff's protected activity and the termination as to these defendants.

Lastly, while Bhatnagar allegedly was aware of Plaintiff's intention to testify as early as November 2011, Bhatnagar was not employed by DCF until late 2012. (ECF No. 60-40 at 14:14-17.) By that time, Plaintiff was already encountering difficulties in her employment, already referred for a FFD, and issued written warnings. Therefore, the Court also finds there was no casual

connection between Plaintiff's protected activity and her termination as to Bhatnagar. In addition, the fact that Bhatnagar allegedly knew Plaintiff would testify for Barco as early as November 2011 and was employed by DCF in late 2012, but only issued her first PNDA against Plaintiff in July 2013 and referred Plaintiff for her first FFD in September 2013, demonstrates it was not done in retaliation. According to Plaintiff, Bhatnagar knew about Plaintiff's intentions to testify for approximately a year prior to acting on such information. Such timing indicates Bhatnagar did not terminate Plaintiff in retaliation for her decision to testify or refusing to testify on behalf of the State Defendants. Accordingly, Defendants' Motion for Summary Judgment as to Count Five is **GRANTED** in its entirety and Count Six is **GRANTED** as to retaliation only.

### 3. *McDonnell Douglas*

Because the Court finds Plaintiff failed to establish a *prima facie* case of retaliation, it need not apply the *McDonnell Douglas* burden shifting analysis. *Moore*, 461 F.3d at 342; *Romano,* 284 *N.J. Super.* at 549. However, even if Plaintiff could meet all the prongs of a *prima facie* case of retaliation, Defendants had a legitimate, non-retaliatory reason for terminating her and Plaintiff has not provided evidence from which a factfinder would find the employer's reasons was a mere pretext. *Moore*, 461 F.3d at 342. Indeed, the record is replete with complaints about Plaintiff's performance (made by both Defendants and clients) and Plaintiff failed three FFD examinations conducted by Dr. Rapaport. For the sake of brevity, the Court will not reiterate all performance complaints and discuss Plaintiff's FFD examinations, which could be found in the Factual Background or Casual Connection sections of the Opinion.

Plaintiff takes issue with Dr. Rapaport's FFD evaluations and conclusions because she claims he did not conduct an objective evaluation and examination of Plaintiff. (ECF No. 62 at 12-14.) Specifically, she argues Dr. Rapaport "did not examine any new facts in his December 2013

or April 2014 reports, he simply repacked and reproduced the old report from September 2013 and imported the comments wholesale into subsequent reports and then wrote his conclusion." (*Id.* at 13.) The record reflects otherwise. She further takes issue with the fact that Dr. Rapaport did not bother to check with Plaintiff's therapist or psychiatrist for the third report as he did with the second report. (*Id.*) However, Dr. Rapaport attempted to contact Dr. Rahman regarding his note but was unsuccessful. (*Id.* at 462.) The fact Dr. Rapaport did not contact Dr. Rahman is not dispositive, since he also conducted another clinical interview of Plaintiff prior to his conclusions and did not solely rely on prior documentations or reports. Accordingly, Defendants had legitimate non-retaliatory reason for terminating Plaintiff, which Plaintiff fails to prove were merely pretextual.

### B. Punitive Damages

Defendants argue because Plaintiff cannot meet her *prima facie* burdens for her claims of retaliation, nor rebut Defendants' legitimate business reasons for terminating her, they are entitled to judgment as a matter of law on Plaintiff's claims for punitive damages. (ECF No. 60-1 at 16.) Plaintiff argues "Defendants are not entitle [sic] to judgment as a matter of law on Plaintiff's claim for punitive damages because there is evidence of especially egregious conduct and actual participation or willful indifference by upper management." (ECF No. 62 at 16.) Notably, Plaintiff agrees with Defendants' recitation of the law with respect to awarding punitive damages under Title VII and the NJLAD. (*Id.*)

Punitive damages are available in Title VII cases when the defendant employer engages in a discriminatory practice with "malice or reckless indifference to the federally protected rights of an individual." 42 U.S.C. § 1981a(b)(1); *Hargrave*, 262 F. Supp. 2d at 437. The NJLAD provides that for any claim filed under the act, "[a]ll remedies available in common law tort actions shall

be available to prevailing plaintiffs." N.J.S.A. § 10:5-13. Further, in the finding and declaration provision of the NJLAD, it classified the various harms suffered by victims of discrimination and stated "[s]uch harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act." N.J.S.A. § 10:5-3. New Jersey courts have found punitive damages are to be awarded "when the wrongdoer's conduct is especially egregious." *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 624–25 (1993) (quoting *Leimgruber v. Claridge Assocs.,* 73 N.J. 450, 454 (1977)). "[T]he employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." *Id.*

Because the Court finds Plaintiff has failed to establish a *prima facie* case for Title VII or NJLAD retaliation, it finds Plaintiff is not entitled to punitive damages at this time and therefore Defendants' Motion for Summary Judgment is **GRANTED** in part as it applies to Plaintiff's claims for Title VII and NJLAD retaliation, but **DENIED** in all other respects.

### C. PERC & Preclusion

Defendants argue that even if Plaintiff has sufficiently pled a claim for retaliation or asserted a claim for harassment in her Second Amended Complaint, her claims must be dismissed because Plaintiff filed a UPL charge with PERC, PERC had exclusive authority over her claims, and thus PERC's decision collaterally estopped Plaintiff from bringing her claims in this Court. (ECF No. 60-1 at 19.) Plaintiff argues she did not bring a charge before PERC, the PERC case tow which Defendants refer was brought by CWA, and therefore she cannot be barred from asserting her claims. (ECF No. 62 at 17.) She further argues "the Court has always recognized the distinction between a labor and union based claim and a claim based on federal statutory grounds like 42 U.S.C. 1981 and Title VII claims." (*Id.* at 17-18.)

"The Legislature has accorded PERC 'exclusive power' to deal with unfair employer practices." *Hackensack v. Winner*, 82 N.J. 1, 43 (N.J. 1980); *see Del. River Port Auth. v. FOP, Penn-Jersey Lodge* 30, 290 F.3d 567, 578 n.21 (3d Cir. 2002) (stating that under N.J.S.A § 34:13A-5.2, New Jersey's PERC has exclusive jurisdiction over all labor matters). PERC has authority to "make policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration." N.J.S.A. § 34:13A-5.2. In addition, "PERC has exclusive jurisdiction over collective bargaining agreements." *Woodstown-Pilesgrove Reg'l Sch. Dist. Bd. of Ed.*, 164 N.J. Super. 106, 108 (App. Div. 1978), *aff'd*, 81 N.J. 582 (1980).

However, "PERC can only remedy discrimination regarding the exercise of rights guaranteed by the New Jersey Employer-Employee Relations Act ("EERA"), N.J.S.A. §§ 34:13A-1 to 13A-21." *Fioriglio v. City of Atl. City*, 963 F. Supp. 415, 424 (D.N.J. 1997). "PERC has a well-established practice of refusing to hear constitutional claims except insofar as they relate to statutory claims properly before it under the Act." *Kelly v. Borough of Sayreville, N.J.*, 107 F.3d 1073, 1079 (3d Cir. 1997). Further, PERC's jurisdiction does not extend to resolving federal constitutional claims unless such a resolution is necessary to resolve statutory claims properly before it. *Peterson v. City of Long Branch, N.J.*, No. 08-3452, 2009 WL 749589, at *9 (D.N.J. Mar. 19, 2009). In addition, "[i]f the plaintiffs could not have asserted both state and federal claims in a single forum, it would be unfair to force them to sacrifice the claims that could not be so asserted in order to bring a single action in one forum." *Watkins v. Resorts Int'l Hotel & Casino*, 124 N.J. 398, 413-14 (1991). In applying the Entire Controversy Doctrine "to administrative agencies, their potential for achieving sound results must be tempered by a full appreciation of an administrative agency's statutory foundations, its executive nature, and its special jurisdictional

37

and regulatory concerns." *Hackensack*, 82 N.J. at 29. Courts have found the Entire Controversy Doctrine does not preclude plaintiffs from bringing NJLAD and Title VII claims. *See, e.g.*, *Peterson*, 2009 WL 749589, at 8-9 (holding PERC did not have jurisdiction over plaintiff's NJLAD, Title VII, and federal constitutional claims); *Clayton v. City of Atl. City*, 722 F. Supp. 2d 581, 588 n. 7 (D.N.J. June 30, 2010) (noting PERC does not have jurisdiction over NJLAD and federal constitutional claims). Because PERC does not have jurisdiction over Plaintiff's NJLAD or Title VII claims, the Court finds Plaintiff was not barred from bringing those claims in this Court.

Even if PERC had jurisdiction over Plaintiff's NJLAD or Title VII claims, the Court finds Plaintiff is not collaterally estopped or barred from litigating its claims in this Court because PERC did not issue a final judgment on the merits and the parties did not actually litigate the issues of retaliation or harassment. Pursuant to *res judicata*, "a cause of action that was finally determined between parties on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding." *Sadruddin v. City of Newark*, 34 F. Supp. 2d 923, 928 (D.N.J. 1999) (citation omitted). *Res judicata* attaches if there has been: "(1) a final judgment on the merits in a previous lawsuit involving (2) the same parties or their privies and (3) a subsequent action based on the same cause of action." *Peterson*, 2009 WL 749589, at *6 (citation omitted). Under New Jersey law, "[a] dismissal with prejudice constitutes an adjudication on the merits as fully and completely as if the order had been entered after a trial." *Sadruddin*, 34 F. Supp. 2d at 928 (citations omitted); *Kean v. Adler*, 65 F. App'x 408, 415 (3d Cir. 2003) (holding dismissals without prejudice that "are mere procedural rulings" are "not final judgments on the merits").

"Collateral Estoppel is a branch of the broader doctrine of res judicata which bars relitigation of any issue actually determined in an earlier action, generally between the same

parties, although involving a different claim or cause of action." *Sadruddin*, 34 F. Supp. 2d at 928 (citations omitted). This doctrine attaches if: "1) the issue sought to be precluded [is] the same as that involved in the prior action; 2) that issue [was] actually litigated; 3) it [was] determined by a final and valid judgment; and 4) the determination [was] essential to the prior judgment." *Peterson*, 2009 WL 749589, at *6 (citation omitted). "An issue is 'actually litigated' when it is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *O'Leary v. Liberty Mutual Co.*, 923 F.2d 1062, 1066 (3d Cir.1991) (citing Restatement (Second) of Judgments § 27 comment d, at 255) (1982)).

Here, Defendants admit PERC dismissed Plaintiff's ULP charge before PERC for failure to prosecute pursuant to N.J.A.C. 19:14-1.5(d) *without prejudice*. (ECF No. 60-1 at 19.) Therefore, the issues before PERC were not "actually litigated" and PERC did not render a "final judgment" on the merits. Accordingly, Plaintiff is not collaterally estopped or barred from litigating its NJLAD or Title VII claims before this Court.

### D.  Plaintiff's Disability Discrimination and Hostile Work Environment Claims

Defendants argue "the only remaining claims in this case are for retaliation pursuant under [sic] Title VII in Count [Five] and retaliation under the [NJ]LAD in Count [Six]" because "no disability claim under the [NJ]LAD was pled in Plaintiff's Second Amended Complaint." (ECF No. 60-1 at 5.) Plaintiff argues she not only pled disability discrimination under NJLAD in her Second Amended Complaint, but also pled hostile work environment under the NJLAD, and both of these claims survived the motion to dismiss filed by Defendants and the stipulation entered by the parties that was so ordered by the Court. (ECF No. 18 at 18.) Defendants respond by stating they "do not dispute that Plaintiff had the option to plead a claim for disability discrimination following the Motion to Dismiss and the Stipulation," however, they contest Plaintiff "availed

herself of the opportunity to plead such a claim." (ECF No. 66 at 5-6.) They argue Plaintiff did not reassert her disability claim under the NJLAD in Count Six of the Second Amended Complaint. (*Id.*) In the alternative, they argue that even if Plaintiff properly asserted her disability claim in the Second Amended Complaint, her claim is barred because Plaintiff settled her workers' compensation claim, which arose from the same injuries she alleges Defendants' failed to accommodate. (*Id.*)

As a preliminary matter, the Court finds Plaintiff properly pled disability discrimination and harassment in violation on the NJLAD in her Second Amended Complaint. Count Six of the Second Amended Complaint unambiguously states:

> 158. The acts and conduct of the individual Defendants as stated above where Plaintiffs were subjected to race discrimination, national origin discrimination, hostile work environment, and retaliation constitute violations of the NJLAD.
>
> 159. The individual defendants engaged in discrimination against Plaintiff [] because of her disabilities.

(ECF No. 27 ¶¶ 158-59.)

In addition, Plaintiff's disability claim is not barred by her workers' compensation settlement. First, while settlement agreements may bar a plaintiff from relitigating issues previously resolved in a settlement agreement, *In re Princeton-New York Inv'rs, Inc.*, 255 B.R. 376, 388 (Bankr. D.N.J. 2000), Defendants' admit in their briefs the settlement was for worker's compensation benefits regarding Plaintiff's injuries, not NJLAD claims. (ECF No. 66 at 6.) Therefore, the Court finds the settlement agreement does not bar Plaintiff from asserting her NJLAD disability discrimination claim before this Court.

Further, Plaintiff is not collaterally estopped or barred from litigating disability discrimination because it was not actually litigated before the workers' compensation judge and

no final judgment on the merits was issued.[5] Lastly, "the standards for disability under the [NJ]LAD differs from those under the workers' compensation laws." *Megargee v. State Dep't of Human Servs.*, No. A-0736-07, 2009 WL 774821, at *6 (N.J. Super. Ct. App. Div. Mar. 26, 2009). Accordingly, the Court finds Plaintiff has properly pled a claim for disability discrimination and hostile work environment and Defendants' Motion for Summary Judgment as to those claims is **DENIED**.

### E. Defendants' Counterclaim

The State Defendants argue they are entitled to judgment as a matter of law on their counterclaim against Plaintiff. (ECF No. 60-1 at 23.) On July 9, 2015, in response to Plaintiff's Second Amended Complaint, the State Defendants filed a counterclaim against Plaintiff seeking an order granting damages against Plaintiff in the amount of $5,671.70 for use of unearned sick/vacation hours and salary overpayments. (ECF No. 34 at 26.) Since the filing of their counterclaim, the State Defendants issued a Certificate of Debt for Plaintiff's wage overpayments on September 17, 2015 (ECF No. 60-42), and docketed the debt with the Clerk of the Superior Court of New Jersey on the same date (ECF No. 60-2 ¶ 60 and ECF No. 63 ¶ 60). As a result, the Superior Court of New Jersey entered a civil judgment and order in the amount of $5,671.15 on December 7, 2016. (ECF No. 60-43.) Plaintiff's tax refund has been garnished for satisfaction of this debt in the amount of $736.00, therefore, her remaining debt is only $4,935.70. (ECF No. 60-2 ¶ 61 and ECF No. 63 ¶ 61.) Now, instead of seeking a judgment on the same issue of overpayments, the State Defendants ask this Court to "respect and enforce the Superior Court judgment" and seek to collect the outstanding portion of that judgment. (ECF No. 60-1 at 25.)

---

[5] The matter was partially dismissed with prejudice as to some of Plaintiff's injuries (ECF No. 66-2) and settles as to the rest of her claims (ECF No. 66-3.)

"Generally, in a suit on a judgment of a court of one of the states, the Constitution's Full Faith and Credit Clause requires the enforcement of the judgment unless it is shown that the judgment was entered without jurisdiction." *Ayala v. Assured Lending Corp.*, 804 F. Supp. 2d 273, 286-287 (D.N.J. 2011) (citing U.S. Const. Art. IV § 1; 28 U.S.C. § 1738; *Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151 (5th Cir. 1974)). In *Ayala*, a defendant had a state court judgment against the plaintiffs and brought a counterclaim against the plaintiffs seeking to collect the outstanding portion of that judgment. *Ayala*, 804 F. Supp. 2d at 286. The plaintiffs' sole argument in opposition was to contend that since the defendant breached the mortgage agreement by failing to pay the insurance premium, the plaintiffs were entitled to a defense of equitable estoppel. *Id.* at 287. Therefore, this Court recorded and enforced the defendant's judgment. *Id.*

Here, Plaintiff's sole argument in opposition to enforcement of the judgment is that:

> There is no need for this Court to reexamine a matter that was *properly litigated to a conclusion* between Plaintiff and the State. Since the State asserted in their papers that they secured a Superior Court judgment, they should use the mechanisms available to them for the enforcement of that judgment. . . . Defendants do not need a second judgment as they already have a judgment that can be enforced against the Plaintiff. This Court should not be asked to engage in a second analysis in order to provide the Defendants with a judgment that they already have, such an exercise would be a waste of judicial and attorneys' resources.

(ECF No. 62 at 19 (emphasis added).) Plaintiff does not dispute the validity of the Judgment. In fact, Plaintiff admits she overused her sick and vacation time and was overpaid $5,671.70 as a result. (ECF No. 60-2 ¶¶ 56-57 and ECF No. 63 ¶¶ 56-57.) She further admits the State Defendants obtained a New Jersey Superior Court Judgment in that amount. (ECF No. 60-2 ¶ 60 and ECF No. 63 ¶ 60.) Because Plaintiff takes no issue with the judgment and the State Defendants appear to have a valid New Jersey judgment in the amount of $5,671.70, the Court will record the State

Defendants judgment with respect to their counterclaim in the amount of $4,935.70 ($5,6571.70 less $736.00 received from the tax garnishment).

### IV.    CONCLUSION

For the reasons set forth above: (1) Defendants' Motion for Summary Judgment as to Plaintiff's Title VII (Count Five) and NJLAD (Count Six) retaliation claims against all Defendants is **GRANTED**; (2) Defendants' Motion for Summary Judgment as to Plaintiff's claim for punitive damages as it relates to Plaintiff's NJLAD and Title VII retaliation claim is **GRANTED**, but **DENIED** as to all other respects; (3) Defendants' Motion for Summary Judgment as to its counterclaim for entry of judgment against Plaintiff in the amount of $4,935.70 is **GRANTED**; and (4) Defendants' Motion for Summary Judgment as to Plaintiff's NJLAD disability discrimination and hostile work environment claims (Count Six) is **DENIED**.

**Date:** September 26, 2017                    */s/ Brian R. Martinotti*
                                            **HON. BRIAN R. MARTINOTTI**
                                            **UNITED STATES DISTRICT JUDGE**